## UNITED STATES DISTRICT COURT FOR
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **FRANKENMUTH MUTUAL INSURANCE COMPANY**, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. |
| vs. | Hon. |
| **BLUE CROSS BLUE SHIELD OF MICHIGAN**, a Michigan Nonprofit Healthcare Corporation; **ASCENSION HEALTH**, a Missouri Nonprofit Healthcare Corporation; Alpena Regional Medical Center; Genesys Regional Medical Center; St. Mary's of Michigan Medical Center; St. Joseph Health System; Health d/b/a Borgess Medical Center; St. John Providence Health System d/b/a/ St. John Hospital; St. John Providence Health System d/b/a/ Southfield Providence Hospital; St. John Providence Health System d/b/a/ Providence Park Hospital – Novi; St. John Providence Health System d/b/a/ St. John Hospital - North Shore Campus; St. John Providence Health System d/b/a/ St. John Macomb - Oakland Hospital; St. John Providence Health System d/b/a/ St. John River District Hospital - East China; Botsford Hospital; Covenant HealthCare d/b/a Covenant Medical Center; Dickinson County Healthcare System d/b/a Dickinson County Memorial Hospital; Gratiot Community Hospital; Marquette General Health System d/b/a Marquette General Hospital; Metro Health d/b/a Metro Health Hospital; MidMichigan Health d/b/a MidMichigan Medical Center – Midland; Munson Healthcare d/b/a Munson Medical Center; Sparrow Health System d/b/a Sparrow Hospital; William Beaumont Hospital - Royal Oak; William Beaumont Hospital – Troy; and William Beaumont Hospital - Grosse Pointe, | **CLASS ACTION COMPLAINT** **AND JURY DEMAND** |
| Defendants. | |

## I.     INTRODUCTION

1.    This is a class action brought against Defendant Blue Cross Blue Shield of Michigan ("Blue Cross") and twenty three (23) hospitals and health systems (the "Hospital Defendants"). Since 2007, Blue Cross and the Hospital Defendants have illegally contracted,

1

conspired and engaged in anti-competitive conduct, including the execution and enforcement of a special type of "most favored nation" clause known as an "MFN-plus" contract which requires the Hospital Defendants to charge higher prices for hospital services to non-Blue Cross purchasers and insureds by fixed percentages ranging from 23% to 39%.  As explained more fully in the complaint for injunctive relief recently filed by the United States Department of Justice and the Attorney General of the State of Michigan, Defendants' MFN-plus agreements have harmed competition by: (1) reducing the ability of other health insurers to compete with Blue Cross, or actually excluding Blue Cross' competitors in certain markets; (2) raising the prices for hospital services paid by Blue Cross' competitors and by all non-Blue Cross purchasers and insureds; and/or (3) by fixing and inflating the prices the Hospital Defendants charge for hospital services.

2.      Defendants' MFN-plus agreements are per se violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772, and have unlawfully fixed prices and restrained trade throughout the relevant markets.

## II.      BACKGROUND

3.      Blue Cross is by far the largest provider of commercial health insurance in Michigan and has been for many years.  Blue Cross' commercial health insurance policies cover more than three million Michigan residents, more than 60% of the commercially insured population.

4.      Blue Cross insures more than nine times as many Michigan residents as its next largest commercial health insurance competitor. Blue Cross had revenues in excess of $10 billion in 2009.  Blue Cross has market power in the sale of commercial health insurance in each of the relevant geographic markets alleged below.

5.      Blue Cross competes with for-profit and nonprofit health insurers.

6.      Blue Cross is also the largest non-governmental purchaser of health care services, including hospital services, in Michigan.  As part of its provision of health insurance, Blue Cross purchases hospital services on behalf of its insureds from all 131 general acute care hospitals in the state. Blue Cross purchased more than $4 billion in hospital services in 2007.

7.      Over the past several years, Blue Cross has sought to include MFNs (sometimes called "most favored pricing," "most favored discount," or "parity" clauses) in many of its contracts with hospitals.  Blue Cross currently has agreements containing MFNs or similar clauses with at least 70 of Michigan's 131 general acute care hospitals.  These 70 hospitals operate more than 40% of Michigan's acute care hospital beds.

8.      Blue Cross generally enters into two types of MFNs, which require a hospital to provide hospital services to Blue Cross' competitors and all non-Blue Cross purchasers and insureds either at higher prices than Blue Cross pays or at prices no less than Blue Cross pays. Both types of MFNs inhibit competition:

(A)     "MFN-plus." Blue Cross has signed MFN-Plus agreements with at least 23 Hospitals that require the Hospitals to charge some or all other commercial insurers *more* than the Hospitals charge Blue Cross, typically by a specified percentage differential. These Hospitals include major hospitals and hospital systems, and all of the major hospitals in some communities.   These 23 Hospitals operate approximately 45% of Michigan's tertiary care hospital beds.  (A tertiary care hospital provides a full range of basic and sophisticated diagnostic and treatment services, including many specialized services.)   Defendants' MFN-plus clauses require that some Hospitals charge Blue Cross' competitors and all non-Blue Cross purchasers and insureds as much as 40% more than they charge Blue Cross.  Two Hospital contracts with MFN-plus clauses also prohibit giving Blue Cross' competitors and all non-Blue Cross purchasers and insureds better discounts than they currently receive during the life of the Blue Cross contracts.  Defendants' MFN-plus clauses guarantee that Blue Cross' competitors and all non-Blue Cross purchasers and insureds cannot obtain hospital services at prices comparable to the prices Blue Cross pays, which limits other health insurers' and purchasers' ability to

compete with Blue Cross and obtain discounts and more favorable pricing for hospital services.  Blue Cross has sought and, on most occasions, obtained MFN-plus clauses when Hospitals have sought significant rate increases.

(B)     "Equal-to MFNs."  Blue Cross has entered into agreements containing Equal-to MFNs with more than 40 small, community hospitals, which typically are the only hospitals in their communities, requiring the hospitals to charge other commercial health insurers at least as much as they charge Blue Cross.  Under these agreements, Blue Cross agreed to pay more to community hospitals, which Blue Cross refers to as "Peer Group 5" hospitals, raising Blue Cross' own costs and its customers' costs, in exchange for the Equal-to MFN.  A community hospital that declines to enter into these agreements would be paid approximately 16% less by Blue Cross than if it accepts the MFN.  Blue Cross has also entered into Equal-to MFNs with some larger hospitals.

9.      Blue Cross has sought and obtained MFNs in many hospital contracts in exchange for increases in the prices it pays for the hospitals' services.  In these instances, Blue Cross has purchased protection from competition by causing hospitals to raise the minimum prices they can charge to Blue Cross' competitors and all non-Blue Cross purchasers and insureds, but in doing so has also increased its own costs.  Blue Cross has not sought or used MFNs to lower its own cost of obtaining hospital services.

10.     Defendants' MFNs have caused many hospitals to (1) raise prices to Blue Cross' competitors and all non-Blue Cross purchasers and insureds by substantial amounts, or (2) demand prices that are too high to allow competitors to compete, effectively excluding them from the market.  By denying Blue Cross' competitors access to competitive hospital contracts, the MFNs have deterred or prevented competitive entry and expansion in health insurance markets in Michigan, and have increased prices for health insurance sold by Blue Cross and its competitors, and increased prices for hospital services sold to all non-Blue Cross purchasers and insureds, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

11.     The United States Department of Justice and the Michigan Attorney General filed a lawsuit against Blue Cross in this District on October 18, 2010, relying on an in-depth investigation over multiple years alleging antitrust violations of the same nature as set forth in this complaint (Case No. 10-cv-14155).   Much of the information alleged in that complaint is based on information subpoenaed from Blue Cross and the Hospital Defendants.   The Department of Justice and the State of Michigan seek injunctive relief, but they have not requested monetary damages.

### III.     JURISDICTION AND VENUE

12.     Plaintiff brings this action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, and pursuant to Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

13.     Plaintiff has been injured, and is likely to be injured, in its business and property as a result of Defendants' unlawful conspiracy and agreements.

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and principles of pendent and ancillary jurisdiction.   Jurisdiction is also proper under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), as Plaintiff and Defendant Ascension Health are residents of two different states and the amount in controversy exceeds $5 million.

15.     Blue Cross and several of the Hospital Defendants maintain their principal places of business and transact business in this District, and are subject to the personal jurisdiction of this Court.   Venue is proper in this District under Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26.   Blue Cross developed its MFN policy in substantial part in this District, and entered into contracts containing MFNs with hospitals in this district and elsewhere. Blue Cross' conduct has raised and threatens to raise hospital prices and has likely raised health

insurance prices in this District and elsewhere.  Venue in this District is also proper pursuant to 28 U.S.C. § 1391.

## IV.    INTERSTATE COMMERCE

16.    Blue Cross and the Hospital Defendants are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Among other things, increased prices for hospital services and health insurance caused by Defendants' MFNs are, in some cases, paid by health insurers, self-insured employers, consumers and insureds across state lines.  Blue Cross and other insurers provide commercial health insurance that covers Michigan residents when they travel across state lines, and out-of-state carriers provide coverage to their insureds while visiting Michigan.   Additionally, many of Blue Cross' actual and potential competitors are large commercial health insurers and self-insureds which are headquartered or incorporated in other states.

## V.    PARTIES

A.    **Blue Cross**

17.    Defendant Blue Cross is a Michigan nonprofit healthcare corporation headquartered in Southfield, Michigan. Blue Cross is subject to federal taxation but is exempt from state and local taxation under Michigan law.  Directly and through its subsidiaries, Blue Cross provides commercial and other health insurance products, including preferred provider organization ("PPO") health insurance products and health maintenance organization ("HMO") health insurance products.

B.     **The Hospital Defendants**

18.     Defendant Alpena Regional Medical Center is a 146-bed acute care facility located in Alpena, Michigan with a health care team that includes nearly 100 physicians. Alpena Regional Medical Center is a federally-designated rural Regional Referral Center for all of Northeastern Michigan. Upon information and belief, Alpena Regional Medical Center joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

19.     Defendant Genesys Regional Medical Center is a member of Ascension Health and maintains its primary inpatient care facility at Health Park in Grand Blanc, Michigan. Genesys serves patients from Genesee, Shiawassee, Lapeer, Oakland, Livingston and Tuscola counties with at staff of over 140 physicians. Upon information and belief, Genesys and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

20.     Defendant Ascension Health is a $18 billion Catholic healthcare organization and network that provides healthcare services through more than 500 affiliated hospitals and facilities in 20 states. Ascension Health is the Nation's largest non-profit health system and its facilities accept patients without regard to their ability to pay. Ascension Health is Missouri non-profit corporation headquartered in St. Louis. Upon information and belief, Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

21.     Defendant St. Mary's of Michigan Medical Center is a member of Ascension Health and operates 23 specialty medical centers throughout Mid-Michigan, from Birch Run to Standish and Saginaw to Bad Axe. St. Mary's Main Campus is located in Saginaw, Michigan.

Upon information and belief, St. Mary's and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

22.     Defendant St. Joseph Health System is a member of Ascension Health and provides hospital services to a five-country region of Northeast Michigan.  St. Joseph's primary inpatient facility is located in Tawas, Michigan.  Upon information and belief, St. Joseph's and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

23.     Defendant Borgess Medical Center is a part of Borgess Health system which operates 8 hospitals and more than 130 health care facilities located throughout Southern Michigan.  Borgess is a member of Ascension Health.  Based in Kalamazoo, Michigan, Borgess Medical Center serves more than 980,000 people from 10 Michigan counties.  Upon information and belief, Borgess and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

24.     Defendant St. John Hospital & Medical Center is part of the St. John Providence Health System.  St. John is a member of Ascension Health.  St. John Hospital is an 804-bed teaching hospital located in Detroit, Michigan with more than 1,200 physicians on staff.  It is also the largest acute care provided and the only designated Emergency Trauma Center on Detroit's East Side.  Upon information and belief, St. John Hospital and/or St. John Providence Health System and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing

one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

25.     Defendant Southfield Providence Hospital is part of the St. John Providence Health System.  St. John is a member of Ascension Health.  Providence Hospital is a 459-bed hospital located in Southfield, Michigan and serves patients from all over Southeast Michigan with a staff of approximately 1,500 physicians.   Upon information and belief, Southfield Providence Hospital and/or St. John Providence Health System and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

26.     Defendant Providence Park Hospital - Novi is part of the St. John Providence Health System.  St. John is a member of Ascension Health.  Providence Park Hospital - Novi is a 200-bed hospital located in Novi, Michigan.   Upon information and belief, Providence Park Hospital and/or St. John Providence Health System and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

27.     Defendant St. John Hospital - North Shore Campus is part of the St. John Providence Health System.  St. John is a member of Ascension Health.  St. John Hospital - North Shore Campus is a 63-bed community hospital located in Harrison Township.  Upon information and belief, St. John Hospital - North Shore Campus and/or St. John Providence Health System and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

28.     Defendant St. John Macomb-Oakland Hospital is part of the St. John Providence Health System.   St. John is a member of Ascension Health.  St. John Macomb-Oakland Hospital is a 535-bed hospital located in Warren, Michigan.  Upon information and belief, St. John Macomb-Oakland Hospital and/or St. John Providence Health System and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

29.     Defendant St. John River District Hospital is part of the St. John Providence Health System.  St. John is a member of Ascension Health.  St. John River District Hospital is a 68-bed community hospital located in East China Township, Michigan.  Upon information and belief, St. John River District Hospital and/or St. John Providence Health System and/or Ascension Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

30.     Defendant Botsford Hospital is a 330-bed hospital serving Oakland and Wayne counties.  Botsford Hospital is located in Farmington Hills, Michigan.  Upon information and belief, Botsford Hospital joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

31.     Defendant Covenant Medical Center is part of Covenant HealthCare.  Located in Saginaw, Michigan, Covenant Medical Center is a 600-bed hospital that serves 15 counties in East Central Michigan. Upon information and belief, Covenant Medical Center and/or Covenant HealthCare joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

32.     Defendant Dickinson County Memorial Hospital is part of the Dickinson County Healthcare System.  Dickinson County Memorial Hospital is located in Iron Mountain, Michigan and serves the central part of the Upper Peninsula. Upon information and belief, Dickinson County Memorial Hospital and/or the Dickinson County Healthcare System joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

33.     Defendant Gratiot Community Hospital is a 127-bed hospital located in Alma, Michigan.   Upon information and belief, Gratiot Community Hospital joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

34.     Defendant Marquette General Hospital is part of the Marquette General Health System.  Marquette General Hospital is 315-bed specialty care hospital located in Marquette, Michigan and is a federally designated Regional Referral Center.  Upon information and belief, Marquette General Hospital and/or Marquette General Health System joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

35.     Defendant Metro Health Hospital is part of the Metro Health, an independent, integrated healthcare system serving West Michigan and the greater Grand Rapids region.  Metro Health Hospital is 208-bed general acute care hospital located in Wyoming, Michigan.  Upon information and belief, Metro Health Hospital and/or Metro Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

36.     Defendant MidMichigan Medical Center - Midland is part of the MidMichigan Health system, a non-profit health system headquartered in Midland, Michigan.  MidMichigan Health serves a 12-county region with medical centers located throughout Mid-Michigan. MidMichigan Medical Center - Midland is a 265-bed hospital located in Midland, Michigan. Upon information and belief, MidMichigan Medical Center and/or MidMichigan Health joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

37.     Defendant Munson Medical Center is part of Munson Healthcare, a non-profit healthcare organization with 7 hospitals in Northern Michigan serving 24 counties.  Munson Medical Center is a 391-bed hospital located in Traverse City, Michigan, and is the largest hospital in Northern Michigan with over 400 physicians practicing 57 specialties.   Upon information and belief, Munson Medical Center and/or Munson Healthcare joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

38.     Defendant Sparrow Hospital is part of the Sparrow Health System, a network of hospitals and subsidiaries providing health care services throughout Mid-Michigan.  Sparrow Hospital is a 676-bed hospital located in Lansing, Michigan.  Upon information and belief, Sparrow Hospital and/or Sparrow Health System joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

39.     Defendant William Beaumont Hospital - Royal Oak is a 1,.061-bed tertiary hospital located in Royal Oak, Michigan.  Upon information and belief, William Beaumont

Hospital - Royal Oak joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

40.     Defendant William Beaumont Hospital - Troy is a 361-bed hospital located in Troy, Michigan.  Upon information and belief, William Beaumont Hospital - Troy joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

41.     Defendant William Beaumont Hospital - Grosse Pointe is a 289-bed community hospital located in Grosse Pointe, Michigan.  Upon information and belief, William Beaumont Hospital - Grosse Pointe joined Blue Cross' conspiracy by signing and enforcing one or more MFN-Plus contracts with Blue Cross that fix and inflate the price of hospital services in Michigan.

## C.   Plaintiff

42.     Plaintiff Frankenmuth Mutual Insurance Company ("Frankenmuth") is Michigan corporation headquartered in Saginaw County, Michigan.  Frankenmuth along with various operating subsidiaries and affiliates is a $1 billion insurance company that provides auto, home, workers' compensation and others types of insurance to personal and commercial customers. 60% of Frankenmuth's premiums are written in Michigan.

43.     As part of its business, Frankenmuth has directly paid millions of dollars to Blue Cross and to some or all of the Hospital Defendants during the relevant time period and has been injured and damaged by Defendants' conspiracy and unlawful agreements.  As the entity responsible for paying the claims, Plaintiff is economically at risk and is a direct purchaser of hospital services for purposes of the antitrust laws.

## VI.    COMMERCIAL HEALTH INSURANCE IN MICHIGAN

44.    In Michigan, as throughout the United States, individuals who are not disabled, elderly, or indigent, and therefore eligible for Medicare or Medicaid, typically obtain health insurance from commercial health insurance companies.   Employed individuals most often obtain health insurance through their employers, which typically pay the greater share of insurance premiums.   In 2008, approximately 53% of Michigan residents obtained employer provided or other group health insurance.   About 7% obtained individual insurance directly from commercial insurance companies, including Blue Cross.

45.    Commercial health insurers compete to be chosen by employers, employees and self-insureds based on the quality and breadth of their health care provider networks, the level of benefits provided (including out-of-pocket costs in the form of deductibles, co-payments, and coinsurance), price, customer service, reputation, and other factors.   Employers and some other groups typically select the insurance plan or plans they offer to their employees or group members.   Employees or group members then choose whether to enroll in the group health insurance coverage offered to them and, if multiple health insurance plans are offered, choose among the plans offered.

46.    Employers provide group health insurance on either a "fully insured" or a "self-insured" (sometimes called "self-funded") basis.   Under fully insured health insurance policies, the insurer bears the risk that health care claims will exceed anticipated losses.   Under self-insured health insurance policies, the employer pays its employees' insured medical costs itself, so a large portion of that risk is borne by the employer (often subject to stop-loss insurance).

47.    Self-insurance is a viable option primarily for large employers.   Employers that self-insure usually contract with a health insurance company to obtain access to a health care

provider network, including hospitals and physicians, at favorable prices, and for administrative services such as claims processing. The health insurers that provide these network access and administrative services, known in the industry as "administrative services only" ("ASO") arrangements, for self-insured employers with employees in a particular region are generally the same insurers that provide fully insured health insurance in that region.

48.     Blue Cross is the largest provider of ASO services in Michigan, including to the State of Michigan. Blue Cross processed almost $11 billion in health care claims for self-insured employers in 2009. Approximately half of Blue Cross' commercial health insurance business is self-insurance business. Blue Cross earned more than $750 million in ASO fees in 2009.

49.     Most health insurance plans provide insureds with access to a health care provider network including hospitals and physicians. Under these plans, insureds receive greater benefits when obtaining health care services from providers that participate in the insurer's provider network. When an insured receives service from a provider in the insurer's network, the insurer or self-insured employer pays the health care provider at prices and terms negotiated between the insurer and the provider, and the patient often pays a co-pay, a deductible, or a portion of the cost specified in the insurance policy.

50.     Network contracts between insurers and providers typically prohibit the provider from "balance billing" (charging the patient more than the allowable amount agreed to between the insurer and the provider). In contrast, if there is no network or participation agreement between the insurer and the provider, the insurer typically provides a smaller "out-of-network" insurance benefit, if any, and the insured is often responsible for paying the balance of the provider's full charges. The costs of medical care are typically 80% or more of insurers' costs, and hospital costs are a substantial portion of medical care costs. Accordingly, insurers' hospital

costs are an important element of insurers' ability to offer competitive prices and attract employers.

51.    Hospitals and commercial health insurers generally negotiate a discount to be applied to a standardized hospital fee schedule.  The standardized schedule could be set forth as a master list of hospital fees for services (referred to in the industry as a "chargemaster"), a schedule of fees for treatment of a particular illness (typically based on "diagnosis-related groups" or "DRGs" as defined by Medicare and Medicaid), or on another basis.  Blue Cross' equal-to MFNs typically require that hospitals not grant other commercial health insurers better discounts from the fee schedules than Blue Cross receives.  Defendants' MFN-pluses typically require that hospitals not grant other commercial health insurers discounts within a specified percentage of Blue Cross' discounts.

52.    The price of hospital services at individual hospitals directly affects health insurance premiums for the customers that use those hospitals.  Under Michigan law, Blue Cross is allowed to base large employers' group premiums on the group's own health care cost experience, so increases in local hospital prices can lead directly to increased premiums.  Blue Cross is allowed to base its insurance premiums for individuals and small employers (with 50 or fewer employees) on Blue Cross' health care expense experience within geographic areas defined by Blue Cross, among other factors.

53.    As a result, an increase in the price of local hospital services directly increases the premiums that Blue Cross charges to purchasers of individual or small-group policies in that area.  As Blue Cross recognizes, "any increase in our hospital reimbursement rates would have to be passed on in the form of higher premiums for our insured customers, and dollar for dollar increases for those that are self-insured."

54.     Some other health insurers in Michigan also adjust premiums based on the employer's past and anticipated health care costs – which incorporate local hospital costs.  Self-insureds bear the burden of higher hospital prices directly.

## VII.   RELEVANT MARKETS

55.     As alleged below, Blue Cross has market power in the sale of commercial health insurance to groups and individuals in relevant geographic markets throughout Michigan.  Commercial health insurance excludes government programs such as Medicare and Medicaid, and other products offered by health insurers such as Medicare Advantage that are not available to individuals who do not qualify for Medicare or Medicaid.  Commercial health insurance includes self-insurance arrangements described in paragraphs 44-54 above.

56.     Blue Cross' market power and its ubiquitous subscriber base also allows it to dictate the prices hospitals charge for hospital services throughout Michigan.

## A.      Relevant Product Markets

57.     The sale of commercial group health insurance, including access to a provider network, is a relevant product market.  Health insurers compete on the breadth and quality of their provider networks, on premiums, and on the customer's cost of using providers, among other factors.  Group health insurance sold in Michigan usually includes access to a provider network, and most employers and insureds consider an insurer's provider network to be an important element of a health insurance product because the network specifies the physicians and hospitals to which patients can turn for service with substantially lower costs to themselves.

58.     There are no reasonable alternatives to group health insurance, including access to a provider network, for employers or for most employees.  Individual health insurance typically is significantly more expensive than group health insurance, in part because employer

contributions to group health insurance premiums are not taxable to the employee and are tax-deductible by the employer.  Virtually all individual health insurance is purchased by persons who do not have access to employer-sponsored group health insurance.

59.     The sale of commercial individual health insurance, including access to a provider network, is also a relevant product market.  Some Michigan residents without access to group health insurance purchase individual health insurance from commercial health insurers.  Individual health insurance is the only product available to individuals without access to group coverage or government programs that allows them to reduce the financial risk of adverse health conditions and to have access to health care at the discounted prices negotiated by commercial health insurers.  There are no reasonable alternatives to individual health insurance for individuals who lack access to group health insurance or government programs such as Medicare and Medicaid.

60.     Purchasing hospital services directly, rather than through a commercial insurer, is typically prohibitively expensive for most groups and individuals.  Patients without health insurance almost never purchase hospital services directly from hospitals at prices comparable to prices paid by Blue Cross.

61.     Defendants' MFNs apply to hospital services procured for both group and individual commercial health insurance plans, and the anticompetitive effects alleged below have affected and will continue to affect purchasers of both group and individual commercial health insurance.  Group and individual commercial health insurance are referred to herein as "commercial health insurance."

62.     The sale of hospital services is also a relevant product market.  While most individuals are covered by group or employer sponsored insurance plans, many business entities

purchase hospital services directly from Michigan hospitals.  Defendants' MFNs have fixed and inflated the prices for hospital services in Michigan to all non-Blue Cross purchasers and insureds.

**B.     Relevant Geographic Markets**

63.     Markets for hospital services and commercial health insurance, including access to a provider network, are local.  One key component of commercial health insurance is access to a provider network, including primary and tertiary care hospitals.  Because patients typically seek medical care close to their homes or workplaces, they strongly prefer health insurance plans that provide access to networks of hospitals and physicians close to their homes and workplaces. Employers offering group health insurance to their employees therefore demand insurance products that provide access to health care provider networks, including primary and tertiary care hospitals, in the areas in which substantial numbers of their employees live and work.

64.     Individuals purchasing individual health insurance likewise demand insurance products that provide access to health care provider networks, including hospitals, in the areas in which they live and work.

65.     The relevant geographic market for the purpose of analyzing the effect of an MFN between Blue Cross and a hospital on the sale of hospital services and commercial health insurance is the area in which the seller operates and in which the purchaser can practicably turn for supplies or services.

66.     Because an insurer is selling access to a provider network, among other things, the relevant geographic market for analyzing the effect of an MFN between Blue Cross and a hospital on the sale of hospital services and commercial health insurance is the area in which the hospital subject to the MFN operates and in which purchasers and insureds can practicably turn

19

for hospitals included in the provider network offered for sale as part of a commercial health insurance product.

67.     For example, the relevant geographic market for analyzing the effect of the MFN between Blue Cross and Edward W. Sparrow Hospital ("Sparrow"), in Lansing, is the Lansing Metropolitan Statistical Area ("MSA").  Lansing area purchasers and insureds cannot practicably turn to commercial health insurers that do not offer network access to hospitals in the Lansing MSA. (MSAs and Micropolitan Statistical Areas are geographic areas defined by the U.S. Office of Management and Budget.)

68.     The following geographic areas are relevant geographic markets for the sale of hospital services and commercial health insurance:

a.     The western and central Upper Peninsula (Alger, Baraga, Delta, Dickinson, Gogebic, Houghton, Iron, Keweenaw, Marquette, Ontonagon, and Schoolcraft Counties), where Blue Cross has more than 65% of commercially insured lives;

b.     The Lansing MSA (Ingham, Clinton and Eaton Counties), where Blue Cross has approximately 70% of commercially insured lives;

c.     The Alpena area (Alpena and Alcona Counties), where Blue Cross has more than 80% of commercially insured lives;

d.     The Traverse City Micropolitan Statistical Area (Benzie, Grand Traverse, Kalkaska and Leelanau Counties), where Blue Cross has more than 60% of commercially insured lives;

e.     The "Thumb" area (Huron, Sanilac and Tuscola Counties), where Blue Cross has more than 75% of commercially insured lives;

f.     Each of the Detroit, Flint, Kalamazoo, and Saginaw MSAs, and the Alma and Midland Micropolitan Statistical Areas, in each of which Blue Cross has more than 50% of commercially insured lives;

g.     The Grand Rapids MSA, where Blue Cross has more than 45% of commercially insured lives; and

h. Each of Allegan, Iosco, Montcalm, Osceola and St. Joseph Counties, in each of which Blue Cross has more than 40% of commercially insured lives.

69. Blue Cross has an MFN with at least one significant hospital in each geographic market identified above. In the western and central Upper Peninsula, and in the Lansing, Detroit, Flint, Grand Rapids, Kalamazoo and Saginaw MSAs and the Alma and Midland Micropolitan Statistical Areas, Blue Cross has MFN-plus agreements with at least one significant tertiary care hospital. In the Thumb and in Allegan, Iosco, Montcalm, Osceola and St. Joseph counties, Blue Cross has MFNs with all of the hospitals, all of which are community hospitals, in the market.

70. The geographic markets identified above approximate the areas served by the hospitals currently subject to Defendants' MFNs, and approximate the areas in which a commercial health insurer requires a provider network, including primary and tertiary care hospitals, in order to be an effective competitor in that area. Most employed residents of each of these areas work within the area. Residents of these areas generally tend to use the tertiary care hospitals, if any, within these areas for tertiary care hospital services. Therefore, commercial health insurers believe they must include in their networks tertiary care hospitals in these areas in order to compete effectively in the sale of commercial health insurance to employers and residents of these areas.

71. In addition, commercial health insurers believe they must include community hospitals within these areas in order to be able to compete effectively in the sale of commercial health insurance to employers and residents of these areas. Blue Cross' competitors have paid higher prices at community hospitals in these areas as a result of Defendants' MFNs, rather than drop the community hospitals from their networks.

21

72.    In particular, commercial health insurers that offer any HMO product are required by Michigan insurance regulations to include in their HMO networks nearby hospitals for any location in which an HMO product is offered.  Those hospitals include community hospitals that are the only hospitals in certain of the areas identified in paragraph 68 above.  Several of the health insurers seeking to compete with Blue Cross primarily offer HMO products, and approximately 40% of Michigan insureds covered by non-Blue Cross commercial health insurance participate in HMOs.

73.    The residents of the markets identified in paragraph 68 above, and their employers and insurers, are the customers most likely to be affected by Defendants' MFNs. Employers and individuals likely would not reduce purchases of commercial health insurance from commercial health insurers with provider networks in the geographic markets alleged in paragraph 68 above in response to prices above competitive levels by a sufficient amount to make prices above competitive levels over a sustained period of time unprofitable for a monopoly supplier of commercial health insurance in those markets.  Therefore, the sale of hospital services and commercial health insurance, including a provider network, in each of the geographic markets alleged above is a properly defined relevant market for the purpose of analyzing the effects of Defendants' MFNs under the antitrust laws.

## VIII.   BLUE CROSS' MARKET POWER

74.    Blue Cross has market power in the sale of commercial health insurance in each of the alleged relevant geographic markets.   Blue Cross' market power and its ubiquitous subscriber base also allows it to dictate the prices hospitals charge for hospital services in each of the alleged relevant geographic markets.  Blue Cross is far and away the largest provider of health insurance in Michigan, with more than 60% of commercially insured lives (including lives

covered under self-insurance arrangements administered by Blue Cross).  Market shares of the magnitude alleged in paragraph 68 above create an inference of market power.

75.     The inference of Blue Cross' market power arising from its market share is corroborated by Blue Cross' demonstrated ability to exercise that market power by, among other things, raising prices, restricting output, erecting barriers to entry, and excluding competitors, as alleged below.

76.     Blue Cross' market power in each of the alleged markets is durable because entry into the alleged markets is difficult.  Effective entry into or expansion in commercial health insurance markets requires that a health insurer contract with broad provider networks and obtain hospital prices and discounts at least comparable to the market's leading incumbents.  As alleged below, the purpose and effect of Defendants' MFNs is to prevent competing insurers and potential entrants from obtaining discounts from hospitals that would allow them to compete more effectively with Blue Cross.

## IX.     DEFENDANTS' MFNs AND THEIR ANTICOMPETITIVE EFFECTS

## A.     The MFNs and their Terms

77.     Since at least 2007, Blue Cross has sought to include MFNs or similar clauses in many of its agreements with Michigan hospitals.  In some contracts, Blue Cross requires the hospital to contract with any other commercial insurer at rates at least as high as the hospital contracts with Blue Cross – an equal-to MFN.  In others, Blue Cross demands even more and requires the hospital to contract with other insurers at rates *higher* than those paid by Blue Cross, typically by a specified percentage differential – an MFN-plus.  Some MFNs contain very limited exceptions, most notably an exception for commercial health insurers with a *de minimis* presence, as discussed in paragraph 88 below.

78.     Blue Cross currently has MFNs in its contracts with more than half of Michigan's general acute care hospitals.  Very few hospitals have refused Blue Cross' demands for an MFN. Other hospitals' contracts have not been renegotiated in recent years, but Blue Cross is likely to seek MFNs when its contracts with those hospitals come up for renegotiation, especially if the hospital requests a price increase.

79.     Most of Defendants' MFNs require the hospital to "attest" or "certify" annually to Blue Cross that the hospital is complying with the MFN, and they often give Blue Cross the right to audit compliance. Insurers pay hospitals under different formulas, as discussed in paragraph 51 above.  These varying payment methodologies can cause uncertainty for a hospital comparing Blue Cross' effective payment rates with anticipated payment rates from different insurers. Therefore, a hospital seeking to avoid a payment reduction by Blue Cross – generally its largest commercial payer – sometimes contracts with Blue Cross' competitors at prices even higher than the MFN requires, to avoid being penalized if Blue Cross audits the hospital's compliance with the MFN.

80.     Blue Cross' agreements with at least 23 Michigan Hospitals contain MFN-plus clauses.  These hospitals are among the most important providers of hospital services in their respective areas.  The following hospitals or hospital systems have agreements with Blue Cross with MFN-plus clauses:

> a.    Marquette General Hospital, the largest hospital in the Upper Peninsula and the only Upper Peninsula hospital providing tertiary care, where Blue Cross' contract requires the hospital to charge Blue Cross' competitors and all non-Blue Cross purchasers and insureds at least 23% more than the hospital charges Blue Cross.
>
> b.    Sparrow Hospital, the largest hospital in Lansing, where Blue Cross' contract requires the hospital to charge some of Blue Cross' significant competitors and all non-Blue Cross purchasers and insureds at least 12.5% more than the hospital charges Blue Cross.

c.    Ascension Health, Michigan's largest hospital system, which owns nine general acute care hospitals subject to an MFN-plus, including the St. John Providence Health System in the Detroit MSA (five hospitals), Borgess Health in the Kalamazoo MSA, Genesys Regional Medical Center in the Flint MSA, St. Mary's Medical Center in Saginaw, and St. Joseph Health System in Tawas City. Blue Cross' contract with Ascension requires that Ascension's hospitals charge Blue Cross' competitors and all non-Blue Cross purchasers and insureds at least 10% more than the hospitals charge Blue Cross.  Blue Cross agreed to pay Ascension higher rates for hospital services, resulting in Blue Cross' paying an additional $2.5 million annually for this MFN-plus.

d.    Alpena Regional Medical Center in Alpena, Botsford Hospital in Farmington Hills, Dickinson Memorial Hospital in Iron Mountain, and Munson Medical Center in Traverse City.

e.    Metro Health Hospital in Grand Rapids, where Defendants' MFN requires the differential between Blue Cross and other payers to increase over time, to 5% for HMOs and 10% for PPOs.

f.    Two Mid-Michigan Health Hospitals (Midland and Gratiot), where Defendants' MFN requires the hospitals to charge Blue Cross' competitors and all non-Blue Cross purchasers and insureds at least 14% more than the hospital charges Blue Cross.

g.    Both hospitals in Saginaw – Covenant, where Blue Cross' contract requires the hospital to charge most of Blue Cross' competitors and most non-Blue Cross purchasers and insureds at least 39% more than the hospital charges Blue Cross, and St. Mary's, identified above.

h.    Three Beaumont Hospitals in the Detroit MSA (Royal Oak, Troy and Grosse Pointe), where Defendants' MFN require the hospital to charge Blue Cross' significant competitors and most  non-Blue Cross purchasers and insureds at least 25% more than they charge Blue Cross.

81.    In 2007, Blue Cross entered into a "Participating Hospital Agreement" ("PHA") containing an equal-to MFN with each of more than 40 hospitals it classifies as "Peer Group 5" hospitals: small, rural community hospitals, which are often the only hospital in their communities. Under that agreement, Blue Cross committed to pay more to those community

hospitals that agreed to charge all other commercial insurers rates that would be at least as high as those paid by Blue Cross.  Any community hospital that failed to attest compliance with the MFN would be penalized by payments from Blue Cross at least 16% less than if it complied with the MFN

**B.**   **Anticompetitive Effects of Defendants' MFNs**

82.    Blue Cross' existing MFNs, and the additional MFNs that Blue Cross is likely to seek to include in future agreements with Michigan hospitals, have unreasonably lessened competition and are likely to continue to lessen competition by:

> a.    Maintaining a significant differential between Blue Cross' hospital costs and its rivals' costs at important hospitals, which prevents those rivals from lowering their hospital costs and becoming more significant competitive constraints to Blue Cross;
>
> b.    Raising hospital costs to Blue Cross' competitors and all non-Blue Cross purchasers and insureds, which likely reduces those competitors' ability to compete against Blue Cross;
>
> c.    Establishing a price floor below which important hospitals would not be willing to sell hospital services to other commercial health insurers or purchasers  of hospital services and thereby deterring price competition in the market for commercial insurance and hospital services;
>
> d.    Raising the price floor for hospital services to all commercial health insurers and purchasers and, as a result, likely raising the prices for commercial health insurance charged by Blue Cross and its competitors; and
>
> e.    Limiting the ability of other health insurers to compete with Blue Cross by raising barriers to entry and expansion, discouraging entry, likely raising the price of commercial health insurance, and preserving Blue Cross' leading market position.

83.    Blue Cross often receives substantially better discounts for hospital services than other commercial health insurers receive.  Blue Cross knows that its discounts provide a competitive advantage against other health insurers.  Blue Cross noted in April 2009 that its

"medical cost advantage, delivered primarily through its facility [*i.e.*, hospital] discounts, is its largest source of competitive advantage," and earlier stated that its advantages in hospital discounts "have been a major factor in its success in the marketplace."

84.    In recent years, Blue Cross became concerned that competition from other insurers was eroding its hospital discount advantage – as it was.  Blue Cross therefore sought to preserve its discount advantage by obtaining MFN-plus clauses, with the "expectation . . . that we would not have any slippage in our differential from what we experience today."  In other words, rather than seeking lower prices from hospitals, Blue Cross negotiated MFN-plus clauses to maintain its discount differential and prevent potential competitors and all non-Blue Cross purchasers and insureds from obtaining hospital services at prices close to Blue Cross' prices and thereby becoming more significant competitive constraints on Blue Cross.  During negotiations in 2008 with one hospital in Grand Rapids, Blue Cross wrote that "we need to make sure they [the hospital] get a price increase from Priority if we are going to increase their rates."

85.    In most cases, Blue Cross obtained an MFN from a hospital by agreeing to increase its payments to the hospital.  Blue Cross has sought and, on most occasions, obtained MFN-plus clauses when hospitals have sought significant rate increases.  Blue Cross also agreed to increase rates to Peer Group 5 hospitals as part of the Peer Group 5 PHA, which included an equal-to MFN. Had a hospital not agreed to an MFN, Blue Cross likely would not have agreed to pay the higher rates sought by the hospital.  Thus, the likely effect of the MFN has been to raise the prices of hospital services paid by both Blue Cross and its competitors and all non-Blue Cross purchasers and insureds, and to increase health insurance prices charged by Blue Cross and its competitors.

86.     Defendants' MFNs have resulted and are likely to continue to result in these anticompetitive effects in each of the relevant markets because they effectively create a large financial penalty for hospitals that do not accept them.  Blue Cross patients are a significant portion of these hospitals' business, and Blue Cross patients typically are more profitable than Medicare and Medicaid patients, the hospitals' other most significant sources of business.  A hospital that would otherwise contract with a competing insurer at lower prices than it charges Blue Cross would have to lower its prices to Blue Cross pursuant to the MFN if it sought to maintain or offer lower prices in contracts with other commercial insurers.  The resulting financial penalty discourages a hospital with a MFN from lowering prices to health insurers competing with Blue Cross or other purchasers of hospital services.  Defendants' MFNs have caused hospitals to raise prices charged to other commercial health insurers and purchasers, rather than lower prices to Blue Cross.

87.     Prior to Blue Cross' obtaining MFNs, some hospitals gave greater discounts to some other commercial health insurers than they gave to Blue Cross.  Without Defendants' MFNs, some hospitals had an incentive to offer lower prices to other insurers seeking to enter or expand in the hospital's service area and increase competition in the sale of commercial health insurance.

88.     Some of Defendants' MFNs allow for *de minimis* exceptions to the MFN. For example, Defendants' MFN with Sparrow Hospital applies to a "significant non-governmental payor . . . whose charges exceed 1.0% of [Sparrow's] total gross patient service charges."  The hospital can charge lower prices to an insurer that does not cross the *de minimis* threshold. An increase in that insurer's business at the hospital, however, would trigger the MFN and subject the prices the insurer pays Sparrow to the MFN's threshold.   Blue Cross' contract with

Beaumont Hospitals has similar provisions.  A clause of this type is likely to have the anticompetitive effect of limiting the growth of commercial health insurers with small shares and more favorable discounts than Blue Cross.

89.     Blue Cross' use of MFNs has caused anticompetitive effects in the markets for commercial health insurance in the geographic markets discussed below, among others. Hospitals in these markets have raised prices to some commercial health insurers, and declined to contract with other commercial health insurers at competitive prices.  As a result, commercial health insurers that likely would have entered local markets to compete with Blue Cross have not done so, or have competed less effectively than they would have without the MFNs. Defendants' MFNs therefore have helped Blue Cross maintain its market power in those markets.  The actual anticompetitive effects alleged below illustrate the types of competitive harm that have occurred and are likely to occur where Blue Cross obtains MFNs from hospitals throughout Michigan.

### 1.   *Marquette and the Upper Peninsula*

90.     In 2008, Blue Cross entered into a provider agreement with Marquette General Hospital that contained an MFN-plus requiring Marquette General to charge other insurers at least 23% more than it charges Blue Cross – a cost differential that would severely limit a competitor's ability to compete with Blue Cross.  Blue Cross agreed to pay significantly higher prices for hospital services at Marquette General in exchange for an MFN-plus.

91.     Blue Cross is by far the largest commercial health insurer in the Marquette area and in the Upper Peninsula, with more than 65% of the commercially insured population of the eleven counties of the western and central Upper Peninsula (identified above). Blue Cross views the Upper Peninsula as a strategically important region, and believes that "no competitor of size

exists in the UP as of today."  Blue Cross raised its health insurance premiums in the Upper Peninsula by 250% from 1999 to 2004, "well out of proportion to the rest of the state," according to a Blue Cross document.

92.     Marquette General, a 315-bed tertiary care hospital, is the largest hospital and the only tertiary care hospital in Michigan's Upper Peninsula.  Marquette General offers more complex surgeries (such as neurosurgery and cardiac surgery), trauma care, and other services that are not available at any other hospital in the Upper Peninsula.  The closest tertiary care hospital to Marquette is in Green Bay, Wisconsin, 178 miles away; the closest tertiary care hospital in Michigan is in Petoskey, in the northern Lower Peninsula, 203 miles away.

93.     Because a commercial health insurer must provide its subscribers with reasonable access to tertiary hospital care to be able to market a health insurance product, commercial health insurers that seek to market a competitive health insurance plan in the central and western Upper Peninsula must contract with Marquette General at prices that are competitive with Blue Cross' prices.  The MFN prevents Marquette General from contracting with other commercial health insurers at prices competitive with Blue Cross' hospital prices.

94.     There are several small, community hospitals in the Upper Peninsula.  These hospitals – particularly those in the central and western portions of the Upper Peninsula – generally  refer their more complex cases to Marquette General.  Eleven of the thirteen smaller hospitals in the Upper Peninsula – Baraga County Memorial in L'Anse, Bell Memorial in Ishpeming, Grand View Health in Ironwood, Helen Newberry Joy in Newberry, Iron County Community in Iron River, Aspirus Keewenaw in Laurium, Mackinac Straits in St. Ignace, Munising Memorial in Munising, Ontonagon Memorial in Ontonagon, Portage Health in

Hancock, and Schoolcraft Memorial in Manistique – are Peer Group 5 hospitals and are subject to the equal-to MFN in Blue Cross' Peer Group 5 PHA.

95.     The only hospitals in the Upper Peninsula that do not currently have MFNs in their contracts with Blue Cross are Chippewa County War Memorial Hospital in Sault Ste. Marie, 165 miles from Marquette, and OSF St. Francis Hospital in Escanaba.  Because of its relatively limited scope of services and distance from Marquette, Chippewa War Memorial is not a good alternative to Marquette General for residents of the western or central Upper Peninsula, where 84% of the Upper Peninsula's population resides.  OSF St. Francis also is not a tertiary care hospital and does not offer the range of services offered by Marquette General.  Insurers likely would not market a health plan with a network including Chippewa War Memorial and/or OSF St. Francis, but lacking Marquette General, to residents of the western or central Upper Peninsula.

96.     Priority Health, a Michigan nonprofit health insurer based in Grand Rapids, sought to enter the market for commercial health insurance in the Upper Peninsula and compete with Blue Cross.  Without Defendants' MFN-plus arrangment, Marquette General would have given Priority a discount that would have allowed Priority to compete with Blue Cross, and Priority would have marketed and provided commercial health insurance in the Upper Peninsula. However, Marquette General told Priority it would not offer Priority rates less than those required by Defendants' MFN-plus.  Marquette General accordingly gave Priority a revised offer with a significantly higher rates to comply with Defendants' MFN-plus.

97.     Priority, which had believed it could compete with Blue Cross and attract business if it contracted with Marquette General at rates comparable to those of Blue Cross, concluded that it could not compete with rates at the Upper Peninsula's principal hospital at the

level required by Defendants' MFN-plus. Priority therefore declined to contract with Marquette General at the rates required by the MFN, and did not enter the market for commercial health insurance in the Upper Peninsula. As a result, Blue Cross maintained its leading market share in the commercial health insurance market in the central and western Upper Peninsula. Other commercial health insurers, including Assurant and Health Alliance Plan ("HAP"), likely also would have entered into agreements with Marquette General if they had been able to contract with Marquette General at prices comparable to the prices Blue Cross pays to Marquette General.

98.    When Blue Cross entered into the MFN-plus with Marquette General, Blue Cross knew that Marquette General was considering entering into contracts with other commercial health insurers. Blue Cross demanded the MFN-plus to prevent competitors and all non-Blue Cross purchasers and insureds from obtaining competitive discounts at Marquette General. Blue Cross believed that its contract with Marquette General would, in Blue Cross' own words, "keep blue lock on U.P."

99.    Blue Cross increased the prices it pays other hospitals in the Upper Peninsula to induce the hospitals to agree to MFNs. Blue Cross paid Schoolcraft Memorial a price increase in exchange for accelerating by six months the hospital's commitment to charge all other payers at least as much as it charged Blue Cross.

100.    Defendants' MFNs with Peer Group 5 hospitals and with Dickinson County Hospital (a hospital that is also subject to an MFN) prevent these smaller hospitals in the Upper Peninsula from agreeing to lower prices for Blue Cross' competitors and all non-Blue Cross purchasers and insureds. Defendants' MFNs with Marquette General and other hospitals in the

Upper Peninsula have unreasonably lessened competition in the market for commercial health insurance in the central and western Upper Peninsula.

## 2.   *The Lansing Area*

101.    In June 2009, Blue Cross entered into a ten-year provider agreement with Sparrow Hospital, the largest hospital in the Lansing area.  That contract includes an MFN-plus that requires Sparrow to charge other insurers at least 12% more than Blue Cross pays.  That contract also provides that Blue Cross would raise its rates to Sparrow by $5 million per year more than under Blue Cross' standard contract with similar hospitals.  This MFN-plus likely will result in a price increase in 2011 to the third largest insurer in Lansing.

102.    The two largest – and only tertiary care – hospitals in the Lansing area are Sparrow Hospital and Ingham Regional Medical Center ("IRMC").  Each of these two major hospitals has strengths in different fields.  Lansing area employers and employees generally prefer health insurers that can provide network access to (and discounts at) both hospitals.  Consequently, each of these hospitals is important to health insurers that seek to offer a provider network in the Lansing area.  Without access to both hospitals at competitive rates, insurers cannot offer health insurance plans to Lansing area employers or residents on terms or at premiums that would be competitive with Blue Cross products.

103.    Blue Cross is by far the largest commercial health insurer in the Lansing area, with approximately 70% of insured lives.  The three largest commercial health insurers in the Lansing area, which in the aggregate insure 93% of residents with commercial group health insurance in the Lansing area, are Blue Cross, Physicians' Health Plan ("PHP"), which is owned by Sparrow's parent, and McLaren Health Plan, which is owned by McLaren Healthcare

Corporation, the owner of IRMC. Each of these three health insurers has competitive discounts at both hospitals.

104. Sparrow and IRMC agreed in 2006 to contract with each others' health plans at favorable, "mutual and equitable" rates, to obtain comparable rates for each of their own health plans at the competing hospital. Consequently, PHP and McLaren are the only health insurers that obtain hospital services in the Lansing area at rates comparable to the rates paid by Blue Cross. Other insurers do not receive competitive prices.

105. Defendants' MFN with Sparrow provides that Sparrow's existing agreements with other insurers are grandfathered until January 1, 2011. After that date, Defendants' MFN will likely require Sparrow to raise prices to McLaren. The resulting higher costs will reduce McLaren's effectiveness as a competitor to Blue Cross, which will likely reduce competition and raise prices for commercial health insurance in the Lansing area. The MFN with Sparrow also prevents other potential entrants into the Lansing area, such as Priority Health and Health Plus, from entering the market in a manner that would create effective price competition to Blue Cross.

106. Blue Cross also has equal-to MFNs with the three smaller hospitals in the Lansing area: Hayes Green Beach Memorial Hospital in Charlotte, Eaton Rapids Medical Center in Eaton Rapids, and Clinton Memorial Hospital in Saint Johns. The adoption of an MFN caused Eaton Rapids and Hayes Green Beach to increase their prices to Blue Cross' competitors and all non-Blue Cross purchasers and insureds by significant amounts. Defendants' MFNs with these smaller hospitals in the Lansing area have also prevented Blue Cross' competitors and all non-Blue Cross purchasers and insureds from obtaining better rates than Blue Cross at these hospitals. Rather than providing a means to ensure that Blue Cross would pay the lowest prices

paid by its competitors, the MFNs had the opposite effect – raising the prices paid by Blue Cross' competitors and all non-Blue Cross purchasers and insureds.

107.    Defendants' MFNs with Sparrow and other hospitals in the Lansing MSA have unreasonably restrained trade and lessened competition, or will likely do so in the future, in the market for commercial health insurance in the Lansing MSA.

### 3.   *The Alpena Area*

108.    Alpena Regional Medical Center ("Alpena Regional") is the only tertiary care hospital in Alpena County and in the northeastern Lower Peninsula.  The nearest tertiary care hospitals are in Petoskey, 100 miles west, and Bay City, 140 miles south.  Alpena Regional is important to health insurers that seek to offer a provider network in the Alpena area.  Without access to Alpena Regional at rates competitive with Blue Cross' rates, other insurers cannot offer health insurance plans to Alpena area employers or residents at premiums competitive with Blue Cross products. Currently, the only two commercial health insurers with significant business in the Alpena area are Blue Cross and Priority.  Blue Cross has a market share of more than 80% in the Alpena area.

109.    In late 2009, Blue Cross and Alpena Regional negotiated a new contract.  Blue Cross offered a substantial rate increase "contingent on the formalization of the most favored discount." In addition, Blue Cross sought and obtained a commitment by Alpena Regional that it would not improve the discount given to any other health insurer during the four-year life of the contract – a clause that, according to Blue Cross, "prohibits allowing better discounts to be negotiated with payors."

110.    Pursuant to Blue Cross' MFN, Alpena Regional reduced Priority's inpatient discount, which increased the prices Priority pays for inpatient services significantly above the

prices Blue Cross pays.   The MFN therefore likely resulted in a substantial reduction in competition in the sale of commercial health insurance in the Alpena area.

### 4.   *The Traverse City Area*

111.   Munson Healthcare owns Munson Medical Center ("Munson") in Traverse City, Paul Oliver Memorial Hospital in Frankfort, and Kalkaska Memorial Medical Center in Kalkaska, all of which are in the Traverse City Micropolitan Statistical Area.   Munson is the only tertiary care hospital in the market, and Paul Oliver and Kalkaska are the only other hospitals in the market.   The nearest tertiary care hospital other than Munson is in Petoskey, 66 miles north of Traverse City, and is not a reasonable substitute for Munson for Traverse City residents or for insurers seeking to sell commercial health insurance to residents of the Traverse City area. Munson, Paul Oliver and Kalkaska are each vital to health insurers seeking to offer a provider network in the Traverse City area.   Without access to these hospitals at competitive rates, insurers cannot offer health insurance plans to Traverse City area employers or residents at premiums competitive with Blue Cross products.

112.   Blue Cross has entered into an agreement with Munson that requires Munson to charge other health insurers more than it charges Blue Cross.   Blue Cross has entered into the Peer Group 5 PHA with Paul Oliver and Kalkaska, causing them to charge other health insurers at least as much as they charge Blue Cross.   Blue Cross has a market share of more than 60% in the Traverse City area.

113.   Paul Oliver and Kalkaska had previously agreed to grant greater discounts to Priority and Aetna than they had granted to Blue Cross.   Defendants' MFNs caused Paul Oliver and Kalkaska to raise their prices significantly to these Blue Cross' competitors and all non-Blue Cross purchasers and insureds.   The price increases substantially reduced Blue Cross'

36

competitors' ability to compete against Blue Cross, which reduced competition in the sale of health insurance in the Traverse City area.

### 5.  *The Thumb Area*

114.    There are eight Peer Group 5 hospitals in the three Thumb Counties (Huron, Sanilac and Tuscola):  Caro Community Hospital, Hills and Dales General Hospital, Marlette Regional Hospital, McKenzie Memorial Hospital, Huron Medical Center, Scheurer Hospital, Deckerville Community Hospital, and Harbor Beach Community Hospital.  Blue Cross is the largest provider of commercial health insurance, with a market share of more than 75%, in the Thumb area.

115.    Each of the hospitals in the Thumb area is important to health insurers seeking to offer a provider network to residents there.  Without access to these hospitals at competitive rates, insurers cannot offer health insurance plans to Thumb area employers at premiums that would be competitive with Blue Cross products.

116.    Through the Peer Group 5 PHA, Blue Cross sought and obtained MFNs with Thumb area hospitals with "the realization that some of the[m] are giving commercial carriers discounts that are on par with (or better than) what they give [Blue Cross]."  Blue Cross sought and obtained the MFN clause with Thumb area hospitals over the concern expressed by one hospital that such a clause would "unquestionably . . . operate to drive up costs to other purchasers."  Accordingly, when that hospital accepted the MFN and Blue Cross' higher payments, it raised another commercial health insurer's rates.

117.    As Blue Cross had believed, other commercial health insurers had received discounts from Thumb area hospitals that were in some cases better than the discounts obtained by Blue Cross.  As a result of the MFN, Thumb area hospitals raised these insurers' rates to

levels equal to or greater than the Blue Cross discount rate.  The commercial health insurers affected by Defendants' MFNs in the Thumb area have paid and are paying higher prices to Thumb area hospitals as a result of the hospitals' agreeing to the MFNs, rather than removing any Thumb area hospitals from their networks.  As a result, Defendants' MFNs with hospitals in the Thumb area have increased costs to competing insurers and to self-insured employers, and reduced insurers' ability to compete, thereby likely lessening competition in the market for commercial health insurance in the Thumb area.

### 6. *Community Hospitals*

118.   As alleged above, Blue Cross has offered community hospitals a participating hospital agreement, the Peer Group 5 PHA, under which the hospitals would be subject to an equal-to MFN.  Most community hospitals have accepted this offer and receive higher payments from Blue Cross in exchange.  These agreements between Blue Cross and community hospitals have caused some hospitals to raise prices to other insurers by significant amounts – often by 100% or more.  For example:

  a.   Bronson LakeView Community Hospital, in Paw Paw, in the Kalamazoo MSA, raised price to a competitor to comply with Defendants' MFN.

  b.   At least two hospitals in Montcalm County raised price to Blue Cross competitors and all non-Blue Cross purchasers and insureds to comply with Defendants' MFNs. Three Rivers Health Medical Center, in Three Rivers, St. Joseph County, raised price to four Blue Cross competitors and all non-Blue Cross purchasers and insureds to comply with the MFN.

  c.   Three Rivers Health Medical Center, in Three Rivers, St. Joseph County, raised price to four Blue Cross competitors and all non-Blue Cross purchasers and insureds to comply with the MFN.

  d.   Allegan General Hospital, in Allegan, Allegan County, raised prices to a Blue Cross competitor to comply with Defendants' MFN.

e.    Spectrum Health Reed City Hospital, in Reed City, Osceola County, raised price to three Blue Cross competitors and all non-Blue Cross purchasers and insureds to comply with the MFN.

119.    In each case, the Blue Cross competitor concluded that it needed the community hospital to be able to offer a network that would allow it to compete with Blue Cross, and thus agreed to pay, and is paying, higher hospital prices.

120.    As a result, Blue Cross' competitors' and all non-Blue Cross purchasers' and insureds' hospital costs have increased, likely increasing the premiums those competitors offer for health insurance products in those areas, increasing costs of those competitors' self-insured customers, reducing competition in the sale of health insurance in those areas, and unreasonably restraining trade and lessening competition in the rural areas served by these hospitals.

121.    The anticompetitive effects alleged in paragraphs 82-120 above illustrate the types of harm that have occurred, and are likely to occur, as a result of Defendants' MFNs. These effects have occurred and are likely to occur in the markets discussed in paragraphs 82-120 above, in the Detroit, Flint, Grand Rapids, Kalamazoo, and Saginaw MSAs, and in the Alma and Midland Micropolitan Statistical Areas.

122.    There are no likely procompetitive or efficiency-enhancing effects of the MFNs that would outweigh the actual and likely anticompetitive effects alleged above.  The MFNs have not led, and likely will not lead, to lower hospital prices for Blue Cross or other purchasers or insureds. On no occasion has one of Defendants' MFNs resulted in Blue Cross' paying less for hospital services.

123.    If not enjoined, Defendants' MFNs with Michigan hospitals are also likely to have anticompetitive effects in the future.  Blue Cross has entered into MFNs with hospitals that are essential components of a competitive provider network.  The MFNs preserve a discount

differential in favor of Blue Cross that is sufficient to prevent effective competition.  Absent an injunction, Blue Cross will seek to enter into and enforce MFN clauses with other hospitals in Michigan, with the purpose and likely effect of preventing effective entry or expansion by its competitors.

## X.      CLASS ALLEGATIONS

124.    Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  All requirements of Fed.R.Civ.P. 23 (a) and (b) are satisfied.

125.    The Class to be certified is defined as follows:

All entities and individuals who during the relevant time period paid for hospital services from any of the 23 Defendant Hospitals at prices inflated by Defendants' MFN-Plus agreements and surcharges.

(Referred to herein as the "Class").

126.    The relevant time period, and thus class period, dates back to the first MFN-Plus agreement signed in approximately 2007.

127.    The individuals in the Class are so numerous that joinder of all members is impracticable. Although the precise number of such entities and individuals is currently unknown, Plaintiff believes that number of class members is sufficiently numerous to warrant class certification.

128.    There are questions of law and fact common to the Class that predominate over any questions solely affecting individual members, including, but not limited to:

a.      whether Defendants violated the Sherman Act and Clayton Act through use of MFN-plus contracts;

b.      whether Defendants violated the Michigan Antitrust Reform Act through use of MFN-plus contracts;

      c.      Whether Defendants' MFN-plus contracts constitute *per se* violations of the federal and state antitrust laws specified above;

      d.      Whether Defendants' actions caused injury to Plaintiff and the Class in the form of inflated prices for hospital services;

      e.      Whether Defendants' actions amount to tortious interference with Plaintiff and Class members' contracts or business expectancies; and

      f.      Whether Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

129.    Plaintiff's claims are typical of those of the Class. Plaintiff, like other members of the Class, was injured by Defendants' illegal agreements and conduct by having to pay inflated prices for hospital services, namely, the surcharges mandated by Defendants' MFN-plus contracts. The inflated prices paid by Plaintiff and the Class were the result of substantially similar contract provisions and common business practices which affected all Class members in a similar way. Plaintiff challenges Defendants' unlawful MFN-plus agreements and business practices under legal theories common to all Class members.

130.    Both Plaintiff and the undersigned counsel are adequate representatives of the Class. Plaintiff is a member of the Class. Given Plaintiff's loss, Plaintiff has the incentive and is committed to the prosecution of this action for the benefit of the Class. Plaintiff has no interests that are antagonistic to those of the Class or that would cause it to act adversely to the best interests of the Class. Plaintiff has retained counsel experienced in class action litigation, including antitrust violations and business torts.

131.    This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(1) and (c)(4) because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants.

132.    This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(2) because Defendants have acted and refused to act on grounds that apply generally to the Class, and final injunctive and declaratory relief is appropriate, and necessary, with respect to the Class as a whole.

133.    This action is maintainable as a class action under Fed.R.Civ.P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class and because a class action is superior to other methods for the fair and efficient adjudication of this action.  Plaintiff is aware of no difficulties which would render the case unmanageable.

134.    Plaintiff and members of the Class have all suffered, and will continue to suffer, antitrust injury and damages as a result of Defendants' MFN-plus contracts and related unlawful conduct.

## COUNT I

(Unlawful Agreement in Violation of § 1 of the Sherman Act)

135.    Plaintiff repeats and realleges the allegations of the above paragraphs.

136.    Blue Cross has market power in the sale of commercial health insurance in each relevant geographic market alleged herein.

137.    Each of the provider agreements between Blue Cross and one or more of the Hospital Defendants containing an MFN-plus provision is a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

138.    Defendants' MFN-plus contracts are *per se* violations of the antitrust laws.

139.    Each of the challenged MFN-plus agreements has had, or is likely to have, substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a.    Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurers in competition with Blue Cross from obtaining competitive pricing from critical hospitals;

b.    Unreasonably restricting the ability of hospitals to offer to Blue Cross' competitors or potential competitors reduced prices for hospital services that the hospitals and insurers consider to be in their mutual interest;

c.    Unreasonably limiting entry or expansion by competitors or potential competitors to Blue Cross in Michigan commercial health insurance markets;

d.    Raising the prices of hospital services to commercial health insurers in competition with Blue Cross, and to other purchasers of hospital services in general;

e.    Raising the prices of hospital services and commercial health insurance; and

f.    Depriving purchasers of hospital services and commercial health insurance of the benefits of free and open competition.

140.    The procompetitive benefits, if any, of these provider agreements do not outweigh the actual and likely anticompetitive effects of the agreements.

141.    Each of the agreements between Blue Cross and the 23 Defendant Hospitals containing an MFN-plus clause unreasonably restrains trade and interstate commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

142.    As part of a common conspiracy to artificially inflate the prices for hospital services throughout the relevant markets, each of the Defendants, including each of the 23 Hospitals, are jointly and severally liable for the full extent of the damages sustained by Plaintiff and the Class.

## COUNT II

(Violation of the Michigan Antitrust Reform Act, MCL § 445.772)

143.     Plaintiff repeats and realleges the allegations of the above paragraphs.

144.     Defendants entered into MFN-plus agreements with 23 Michigan Hospitals that unreasonably restrain trade and commerce throughout the State of Michigan in violation of Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772.

145.     Defendants' MFN-plus contracts are *per se* violations of Michigan's antitrust laws.

146.     Defendants' conduct was not intended to, nor did it have the effect of, reducing the cost of healthcare.

147.     Defendants' challenged conduct was not permitted by the Commissioner of the Office of Financial and Insurance Regulation.

148.     As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have sustained antitrust injury and damages in their respective businesses and property, in amounts which are presently undetermined.

149.     As part of a common conspiracy to artificially inflate the prices for hospital services in the relevant markets, each of the Defendants, including each of the 23 Hospitals, are jointly and severally liable for the full extent of the damages sustained by Plaintiff and the Class.

## COUNT III

(Tortious Interference with Contract or Business Expectancies
against Blue Cross and Ascension Health)

150.     Plaintiff repeats and realleges the allegations of the above paragraphs.

151.     Plaintiff had a contract, business relationship or realistic expectancy or possibility of doing business with each of the Hospital Defendants at the time of the claimed interference.

152.    The contract, business relationship, expectancy or business prospect had a reasonable likelihood of future economic benefit for Plaintiff and the Class.

153.    Blue Cross and Ascension Health knew or should have known of the contract, business relationship or expectancy at the time of the claimed interference.

154.    Blue Cross and Ascension Health intentionally, illegally and improperly interfered with the contract, business relationship or expectancy by executing and enforcing MFN-plus contracts that mandated that the 23 Hospital Defendants inflate the prices charged to Plaintiff and the Class by fixed percentages.

155.    Blue Cross' and Ascension Health's agreements and conduct disrupted and interfered with Plaintiff and the Class's contracts, business relationships or business expectancies at each of the 23 Hospitals.

156.    Plaintiff and the Class have been injured and damaged as a direct result of Defendants' MFN-plus agreements and Blue Cross' and Ascension Health's tortuous interference.

## COUNT IV

### (Unjust Enrichment)

157.    Plaintiff repeats and realleges the allegations of the above paragraphs.

158.    Defendants have improperly kept for their use and benefit property belonging to Plaintiff and the Class, thereby unjustly enriching themselves at the expense of Plaintiff and the Class.

159.    The retention and use of monies belonging to Plaintiff and the Class has conferred a benefit on Defendants that it would be unfair and unjust for Defendants to retain.

160.    Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Honorable Court:

A.    Certify the action as a class action pursuant to Fed.R.Civ.P. 23 and appoint Plaintiff and their Attorneys as class representative and class counsel respectively;

B.    Adjudge and decree that the provider agreements between Blue Cross and the 23 Michigan Hospitals that contain MFN-plus provisions are *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL § 445.772;

C.    Reform Defendants' MFN-plus contracts to strike the illegal terms and enjoin Defendants from agreeing to, or enforcing, similar provisions in the future;

D.    Award Plaintiff and the Class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the costs of this action including attorneys' fees;

E.    Enter judgment against each of the Defendants named herein, holding Defendants jointly and separately liable for the full extent of the antitrust violations alleged;

F.    Adjudge and decree that Blue Cross tortiously interfered with contracts and/or business expectancies existing, or to be entered into by Plaintiff and the Class with the 23 Defendant Hospitals and award Plaintiff and the Class damages in an amount to be determined at trial; and

G.    Order Defendants to disgorge and refund all monies unjustly obtained at the expense of Plaintiff and the Class, and such further relief as the case may require, or as may be deemed just, proper and equitable by this Court.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated:  November 22, 2010

s/ Jason Thompson (P47184)
SOMMERS SCHWARTZ, P.C.
2000 Town Center, Suite 900
Southfield, MI 48075-1100
 (248) 355-0300
jthompson@sommerspc.com

Lance Young (P51254)
LAW OFFICE OF LANCE C. YOUNG
43311 Joy Road #244
Canton, MI 48187
(734) 446-6932


ATTORNEYS FOR PLAINTIFF